UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cr-99 |
| | ) | |
| TAEKWON MALIK MORRIS, | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION TO DISMISS COUNTS
ONE AND TWO OF THE INDICTMENT**

Taekwon Morris, through counsel, moves the Court to dismiss Counts One and Two of the indictment in this case. First, 18 U.S.C. §§ 922(g)(1) and 922(o) are unconstitutional on their face and as applied to Mr. Morris because they violate the Second Amendment.[1]

**INTRODUCTION**

On June 23, 2022, the Supreme Court issued its opinion in *New York State Rifle & Pistol Association, Inc., et al. v. Bruen*, 597 U.S. 1 (2022). That decision upended Second Amendment doctrine, establishing a two-step analysis rooted in constitutional "text and history." *Id.* at 22. The Supreme Court applied this test again in *United States v. Rahimi*, which addressed a facial challenge to the constitutionality of 18 U.S.C §922(g)(8). *United States v. Rahimi*, 602 U.S. ----, 144 S. Ct. 1889 (2024). *Bruen* instructs that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the government may rebut the presumption of unconstitutionality only by showing that "the regulation is consistent

---

[1] Mr. Morris maintains his facial challenges only to preserve the issues for later review. *See United States v. Canada*, 103 F.4th 257 (4th Cir. 2024) (denying facial challenge to § 922(g)(1)); *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (reaffirming, post-*Bruen*, that at least some machineguns may be banned); *United States v. Price*, 111 F.4th 392, 405 (4th Cir. 2024) (suggesting at least some machineguns have a common purpose that is unlawful, *e.g.*, "waging war").

with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. Criminalizing firearm possession pursuant to 18 U.S.C. §§ 922(g)(1) and 922(o) is unconstitutional under *Bruen*'s "text and history" standard.

At *Bruen*'s first step, the Second Amendment's "plain text" grants "the people" the right to keep and bear arms, and nothing in that text or the Supreme Court's cases suggests felons are not among "the people." Similarly, nothing in that text or the Supreme Court's cases holds that machineguns are not "bearable arms." Mr. Morris and others similarly situated are part of "the people" who have the right to keep and bear arms like the one he is charged with possessing. The Supreme Court's decision in *Rahimi* further supports that the "plain text" of the Constitution protects Mr. Morris as one of "the people" who has armed himself, rendering 18 U.S.C. §§ 922(g)(1) and 922(o) presumptively unconstitutional.

At *Bruen*'s second step, the government cannot rebut the presumption that §§ 922(g)(1) and 922(o) are unconstitutional. Regarding § 922(g)(1), this country's "historical tradition of firearm regulation" shows that felon-disarmament laws did not appear until the 20th century, well after the period *Bruen* deems relevant. And the government cannot discharge its burden by likening § 922(g)(1) to laws that disarmed supposedly "dangerous" or "unvirtuous" groups. Those categories are far too broad under a proper *Bruen* analysis, as confirmed by the Supreme Court in *Rahimi*. 144 S. Ct. at 1903. *Bruen* and *Rahimi* require that if a modern regulation such as § 922(g)(1) burdens a United States' citizen's constitutional right to arm themselves in self-defense, the government must prove a history and tradition of regulating conduct that is "relevantly similar" to the modern regulation. *Bruen*, 597 U.S. at 28-29. The government cannot satisfy this burden because it can point to no historical regulation or statute that is relevantly similar to § 922(g)(1). With respect to § 922(o), the United States' "historical tradition of firearm regulation"

shows that laws can prohibit possession of only those arms that are both dangerous and unusual. As further set forth below, nearly three quarters of a million people legally own machineguns in the United States—making the possession of such weapons far from unusual. The data is even more stark for Glock switches, which are now the most common "firearm" seized by law enforcement.

Accordingly, this Court must dismiss Counts One and two of the indictment against Mr. Morris.

**RELEVANT FACTS**

On June 8, 2024, Mr. Morris was driving east on Bonney Road in Virginia Beach, Virginia. Officers with the Virginia Beach Police Department's "Crime Suppression Squad" were following him. At the intersection of Bonney Road and Rosemont Road, Mr. Morris allegedly exited his BMW and briefly went to examine one of the rear tires. The officers behind him initiated a traffic stop, nominally based on observations that the BMW did not have a front tag and its temporary rear tag had expired in April 2024. The officers approached Mr. Morris on foot, and one asked if he was okay. Mr. Morris stated he was. An officer then informed him that they were initiating a traffic stop and ordered him to stand in front of his vehicle. Mr. Morris allegedly began to run across the intersection. The officers pursued and subdued Mr. Morris, who allegedly apologized for running before admitting that he was a felon and there was a gun in the car. The police seized cash, pills, a personal quantity of marijuana, and a Glock 19 Gen 5, 9mm semi-automatic handgun that was equipped with an auto sear or "Glock switch" designed to convert the firearm to become fully automatic.

On September 11, 2024, the government indicted Mr. Morris for, among other criminal offenses, allegedly possessing a firearm after having been convicted of a felony in violation of 18

U.S.C. § 922(g)(1)—Count One—and possessing a machinegun in violation of 18 U.S.C. § 922(o)—Count Two. Mr. Morris has pleaded not guilty and is awaiting trial in this matter.

Mr. Morris has one prior felony conviction for a nonviolent offense; Grand Larceny - Firearm, Va. Code § 18.2-95 (June 13, 2017); and two probation revocations for that felony (1) Felony Revocation, Va. Code § 18.2-306 (October 22, 2018); and (2) Probation Violation, Va. Code § 18.2-306 (March 11, 2022). Mr. Morris has not had his firearm rights restored.

## ARGUMENT

I.   **Second Amendment law has evolved from *Heller*'s initial recognition of the right to bear arms to *Bruen*'s establishment of the "text and history" standard and the "how" and "why" metric clarified in *Rahimi*.**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized that, based on history and the text of the Second Amendment, the amendment "conferred an individual right" "to possess and carry weapons in case of confrontation." *Id.* at 576, 582, 592-95. Further, possessing ammunition—whether already loaded into a gun or available for reloading—is inherent in the right to bear arms. *See United States v. Miller*, 307 U.S. 174, 180-82 (1939) (describing and quoting militia laws in effect at the time Second Amendment passed requiring possession of ammunition).

In *Heller*, the Supreme Court only resolved the specific Second Amendment claim raised in that case. The Court did not definitively establish a test for evaluating other Second Amendment claims, define the broader contours of the fundamental Second Amendment right, or delimit the outer bounds of that right. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1050 (11th Cir. 2022) (Newsom, J., concurring) (recognizing that *Heller* left the lower courts "in an analytical

vacuum"); *Silvester v. Becerra*, 138 S. Ct. 945, 947 (2018) (Thomas, J., dissenting from denial of certiorari) (acknowledging that the Supreme Court "has not definitively resolved the standard for evaluating Second Amendment claims").

It was not until *Bruen* that the Supreme Court set forth an actual "test" for deciding the constitutionality of firearm regulations. *Bruen* clarified the "text and history" approach alluded to in *Heller* by newly bifurcating "text" and "history" into separate steps of an analysis to be used for deciding the constitutionality of all firearm regulations going forward. *Bruen*, 597 U.S. at 17.

At Step One of *Bruen*'s test, courts consider only whether "the Second Amendment's plain text covers an individual's conduct." *Id.* If it does, *Bruen* held, "the Constitution presumptively protects that conduct." *Id.* Regulating presumptively protected conduct is unconstitutional unless the government, at Step Two of the analysis, can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation"—that is, the tradition in existence "when the Bill of Rights was adopted in 1791." *Id.* at 37.

*Bruen* further articulated specific burdens and rules to govern the historical "tradition" inquiry. First, *Bruen* made clear that the burden of proof at Step Two rests entirely with the government. The government alone must "establish the relevant tradition of regulation." *Id.* at 33-34, 58 n.25. If it does not, courts "are not obliged to sift the historical materials for evidence to sustain the [challenged] statute." *Id.* at 60. Rather, consistent with ordinary "principle[s] of party presentation," courts must "decide a case based on the historical record compiled by the parties." *Id.* at 25 n.6. If that record yields "uncertainties," courts should rely on *Bruen*'s "default rules"— the presumption of unconstitutionality at Step One and the government's burden at Step Two— "to resolve [those] uncertainties" in favor of the view "more consistent with the Second

Amendment's command." *Id.* In other words, and consistent with the rule of lenity, any tie on a Second Amendment challenge goes to the defendant.

Second, the absence of a historical regulation addressing the societal concern is important. If the challenged regulation addresses "a general societal problem that has persisted since the 18th century" the lack of a "distinctly similar" historical regulation is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. *Id*. at 26-27. At the threshold, then, courts faced with a *Bruen* challenge must identify the problem at which a statute is aimed and determine whether it existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. *Id.* at 27-28. This is the "why" metric discussed in *Bruen* and *Rahimi*.

Third, the government's burden at Step Two of the *Bruen* analysis requires the government to show that the challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.* And a "tradition" of regulation requires more than one or two isolated examples. It requires a "widespread" historical practice "broadly prohibiting" the conduct in question. *Id.* at 36, 38. Although *Bruen* did not establish a clear threshold for determining when a historical practice rises to the level of a "tradition," it did hold that "a single law in a single State" is not enough and expressed doubt that regulations of three of the thirteen colonies "could suffice." *Id.* at 35, 45-50, 65-66.

Fourth, the government's burden at Step Two of the *Bruen* analysis also requires the government to show that the challenged regulation "is consistent" with this country's historical tradition of gun regulation. The regulation must consistently proscribe the manner of gun possession as was done at the time of the founding. *See Rahimi*, 144 S. Ct. at 1898 ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the

right if it does so to an extent beyond what was done at the founding."). This equates to the "how" of the regulation as discussed in *Bruen* and *Rahimi*.

Fifth, *Bruen* underscored that courts must take careful account of the relevant time frame. The Court stated, "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 597 U.S. at 4. As recognized in *Heller*, "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them," which in the case of the Second Amendment was in 1791. *Id*. The longer a historical regulation pre- or post-dates this period, *Bruen* clarified, the less relevance it carries. *Id*. at 34-37. While historical practices "from the early days of the Republic" may be relevant in interpreting an "ambiguous constitutional provision" if the practice was "open, widespread, and unchallenged," *id.* at 35, the relevance of such practices quickly fades and ultimately vanishes as one approaches the mid- to late-19th century. *Id.* at 36-37. At most, practices from the mid-late 19th century can provide "secondary" evidence to bolster or provide "confirmation" of a historical tradition that "had already been established." *Id*. at 37. But indisputably, by the time one gets to the 20th century, the relevance of historical evidence is all but nonexistent, so much so that the Court declined to "address any of the 20th century historical evidence brought to bear by [the government] or their amici." *Id.* at 66 n.28. In short, to meet the Step Two inquiry, the historical tradition must be "longstanding," *id.* at 40, which means dating from 1791.

## II.  Following *Bruen*, prosecuting Mr. Morris for subsequently possessing firearms as a convicted felon violates the Second Amendment, both facially and as applied.

### a.  The Second Amendment's plain text protects the right of "the people," such as Mr. Morris, to keep and bear arms.

The Second Amendment protects the right of "the people" to keep and bear arms.  Founding era dictionaries define "people" as "those who compose a community," and extending to "every

person." *See, e.g.*, 2 Samuel Johnson, *A Dictionary of the English Language* (1766) ("A nation; those who compose a community"), *available at* https://tinyurl.com/y95erjwf; Thomas Dyche & William Pardon, *A New General English Dictionary* (14th ed. 1771) ("People" "signifies every person, or the whole collection of inhabitants in a nation or kingdom"), *available at* https://tinyurl.com/uk4b4fxd.

Although the Second Amendment's text does not circumscribe "the people" whose rights it guarantees, the government has argued in other cases that "the people" are only "law-abiding, responsible" citizens. Under that view, those with prior convictions for offenses punishable by more than one year imprisonment (including state law misdemeanors punishable by more than two years' imprisonment) are categorically outside the scope of the Second Amendment.

The government's limited interpretation of the Second Amendment is wrong. The Supreme Court in *United States v. Rahimi* rejected the government's theory that Congress can disarm individual citizens because they are not "responsible." The Court stated: "'Responsible' is a vague term. It is unclear what such a rule would entail. Nor does such a line derive from our case law." *Rahimi*, 144 S. Ct. at 1903. Any argument that the Second Amendment only applies to "responsible" citizens is dead after *Rahimi*.

The phrase "law-abiding" is as vague as the phrase "responsible" in this framework. The *Rahimi* Court, in rejecting the government's position that only "responsible" citizens are part of the people, rejected that position as well. *See Rahimi*, 144 S. Ct. at 1944 (Thomas, J., dissenting) ("The Government, for its part, tries to rewrite the Second Amendment to salvage its case. It argues the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding.' Not a single Member of the Court adopts the Government's theory."); *United States v. Coleman*, No. 3:22CR87 (DJN), 698 F. Supp. 3d 851, 861 (E.D. Va. 2023) ("[T]he Government's

reliance on the Supreme Court's various references to law-abiding persons as support for its contention that felons fall outside the scope of the Second Amendment does not persuade this Court. A phrase that malleable cannot be the peg that the Court references to determine who falls within or beyond the protections guaranteed by the Constitution.").

The *Rahimi* Court accepted that Zackey Rahimi was "of the people" as contemplated by the Second Amendment, without discussion. *Rahimi*, 144 S. Ct. at 1987 (stating that "when the government regulates arms-bearing, as when the government regulates other constitutional rights, it bears the burden to 'justify its regulation.'") (quoting *Bruen*, 597 U.S. at 24). The Court made clear the proposed "responsible" limitation did not originate from the Court's case law. *Rahimi*, 144 S. Ct. at 1903. *Heller*'s use of the word "responsible" simply was simply a shorthand for citizens who unquestionably were covered under "the people" of the Second Amendment; it did not define "the people" in its totality. *Id.* In short, the "law-abiding, responsible citizen" theory unanimously rejected by the Supreme Court in *Rahimi* "is the Government's own creation, designed to justify every one of its existing regulations." *Id.* at 1945 (Thomas, J., dissenting). "It has no doctrinal or constitutional mooring." *Id.* To the contrary, *Rahimi* confirms that the Supreme Court meant what it said when it declared that the Second Amendment right "belongs to all Americans." *See Heller*, 554 U.S. at 581.

The Second Amendment text must be accorded its plain meaning—the same meaning it carries in other parts of the Bill of Rights—and "unambiguously" refers to all members of the national community. Thus, because 18 U.S.C. § 922(g)(1) regulates conduct the Second Amendment protects, section 922(g)(1)'s prohibition on felons possessing guns is presumptively unconstitutional under *Bruen*'s plain text standard. *See e.g.*, *Rahimi*, 144 S. Ct. at 1907 (Gorsuch,

J., concurrence) ("In this case, no one questions that the law Mr. Rahimi challenges addresses individual conduct covered by the text of the Second Amendment.").

> **b. *Bruen*'s historical test requires that the government show a robust tradition of "distinctly similar" historical precursors and teaches that exceptions to "the Second Amendment's 'unqualified command'" must be narrowly drawn.**

To rebut the presumption of unconstitutionality, the government must demonstrate that each challenged statute "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 84. Crucially, the nature of that burden varies depending on what kind of problem a statute is designed to address—specifically, whether the problem is old or new. When "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry is "fairly straightforward." *Id.* at 26-27. The government must identify a robust tradition of "distinctly similar" founding-era regulations. *Id.* If "the Founders themselves could have adopted" a particular regulation "to confront [a longstanding] problem," but did not do so, that is evidence the statute is unconstitutional today. *Id.* So, too, if some jurisdictions in the founding era attempted to enact analogous regulations but those proposals were rejected on constitutional grounds. *Id.* Both *Heller* and *Bruen* fell into this category: the laws challenged in those cases were aimed at a problem—"handgun violence, primarily in urban areas"—that existed at the founding, and the Court therefore required a tight fit between those laws and historical precursors. *Id.* A "more nuanced approach" applies only to regulations "implicating unprecedented societal concerns or dramatic technological changes" or addressing a problem that was "unimaginable at the founding." *Id.* at 27.

Felons' access to firearms, at which § 922(g)(1) is directed, has posed a (potential) problem since well before 1791. Section 922(g)(1) is designed to address a general societal problem that has existed since the 18th century: the concern of allowing certain categories of individuals

convicted in the past of criminal conduct to continue to arm themselves in self-defense. Because this is not an "unprecedented societal concern," or "dramatic technological change" the government must provide a distinctly similar historical regulation to show that § 922(g)(1) does not violate the Second Amendment. The government has been unable in other cases to prove such a historical tradition.

The "central considerations" in this analysis are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [*i.e.*, the 'how'] and whether that burden is comparably justified [*i.e.*, the 'why']." *Id.* at 29. The challenged regulation must be similar both in the "how" and the "why" to its historical analogs. *See Rahimi*, 144 S. Ct. at 1898 ("Why and how the regulation burdens the right are central to this inquiry."); *Bruen*, 597 U.S. at 29 ("[O]ur precedents 'point toward at least two metrics [of comparison]: how and why the regulations burden a law-abiding citizen's right to armed self-defense.'"). Otherwise, the government would be gifted a "regulatory blank check" to violate Second Amendment rights. *Rahimi*, 144 S. Ct. at 1944 (Thomas, J., dissenting).

*Rahimi* is an example of this analysis, considering a modern-day societal concern— domestic violence—and the regulations temporarily restricting access to firearms for domestic abusers, in reviewing the historical analogue. Legal consequences, including impacts on citizens' rights to arm themselves, for those who committed domestic abuse and targeted violence towards domestic partners was not something generally accepted as a societal concern at the time the Second Amendment was ratified. *See* Carolyn B. Ramsey, *The Stereotyped Offender: Domestic Violence and the Failure of Intervention*, 120 Penn. St. L. Rev. 337, 346 (2015) (noting that the primary penalty for many domestic abusers was a fine or the stocks in the 17th century). In fact, common law recognized a "right of chastisement" that permitted husbands to physically punish

11

their wives. *See* Reva B. Siegel, "*The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 Yale L.J. 2117, 2121-41 (1996). And, protective orders are an inherently modern approach to addressing the now accepted societal concern of domestic violence. *See* Melvin Huang, *Keeping Stalkers at Bay in Texas*, 15 Tex. J. on C.L. & C.R. 53, 68 (Fall 2009) ("[P]rotective orders first came into existence in 1970 when the District of Columbia passed its Intrafamily Offenses Act. . . . Pennsylvania became the first state to authorize orders when it passed its Protection from Abuse Act in 1976.").

In *Rahimi*, the "how" was a *temporary* restriction on Mr. Rahimi's Second Amendment right to arm himself in self-defense. *Rahimi*, 144 S. Ct. at 1902. The "why" was because he had been determined to be a "credible threat to the physical safety of others." *Id.* at 1896. The *Rahimi* Court connected this "how and why" to a historical tradition of "regulations targeting individuals who physically threatened others . . . ." *Id.* at 1899. The Court reached a narrow holding, rejecting only a facial challenge to the regulation. 144 S. Ct. at 1903 ("In *Heller*, *McDonald*, and *Bruen*, this Court did not 'undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment.' Nor do we do so today. Rather, we conclude only this: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment") (internal citation omitted). Still, *Rahimi's* reliance on and analysis of the historical surety laws and "going armed laws" highlight the lack of historical support for a more permanent, broader ban of Second Amendment rights to a category of people such as Mr. Morris.

Importantly, the "how" in § 922(g)(1) is a functionally permanent infringement on the Second Amendment right to arm oneself in self-defense. The "why" is a perceived issue with a class of citizens based on status and not based on a specific finding of dangerousness or threats to

12

others. *See Rahimi*, 144 S. Ct. at 1898 ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding."); *id.* at 1926 (Barrett, J., concurring) ("To be sure, a court must be careful not to read a principle at such a high level of generality that it waters down the right."). This broad prohibition of a class of people's Second Amendment right to carry arms for self-defense is a far-cry from the specific regulations upheld in *Rahimi* or discussed in *Bruen*. *Cf. id.* at 1938, n.5 (Thomas, J., dissenting) (citing *Bruen*, 597 U.S. at 70 (noting that regulations "limit[ing] the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could carry arms" do not justify "broadly prohibit[ing] the public carry of commonly used firearms for personal defense.")).

The government cannot meet its burden to establish a historical analogue to § 922(g)(1). Because the principle societal concern underlying § 922(g)(1) is not a uniquely modern one, to pass the second part of the *Bruen* test, the government must propose a sufficiently similar regulation that either substantially abridged felons' right to keep and bear arms or permanently denied firearms to some group akin to felons. No such laws from the founding era exist. *See, e.g.*, Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous,"* 25 Tex. Rev. L. & Pol. 245, 291 (2021) (noting the lack of "any direct authority whatsoever" for the view that felons were "deprived of firearm rights" at the founding); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009) (same); *see also Binderup v. Att'y General*, 836 F.3d 336, 360 (3d Cir. 2016) (Hardiman, J., concurring) (dating felon dispossession statutes to 1931 and 1961); *Folajtar v. Att'y General*, 980 F.3d 897, 914-15 (Bibas, J., dissenting) (concluding no founding era case or statute imposed a "near-blanket ban for all felons"); *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir.

2019) (Barrett, J., dissenting). And the government has yet to identify a single historical regulation, let alone a robust history and tradition, that broadly prohibited the ability to arm oneself in self-defense to such categories of people.

The first felon-in-possession laws similar to § 922(g)(1) did not appear until the 20th century. What is today's § 922(g)(1) traces its origins to 1938, when Congress passed a statute, the Federal Firearms Act, prohibiting certain felons from "receiving" firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250, 1251 (1938)). At that time, the statute "covered only a few violent offenses," *id.*, prohibiting firearm "receipt" by those convicted of crimes such as murder, rape, and kidnapping. *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). It was not until 1961 that Congress amended that statute to prohibit "receipt" "by all felons." *Skoien*, 614 F.3d at 640 (citing Pub. L. 87-342, 75 Stat. 757) (noting that under the statute, "possession" was evidence of "receipt"). And it was not until 1968 that Congress formally "changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form." *Id.* Thus, the first firearm regulation in America broadly prohibiting all felons from possessing firearms was not enacted until almost two centuries after our nation's founding, when the modern version of § 922(g)(1) became law. *See Kanter*, 919 F.3d at 464 n.12 (Barrett, J., dissenting) ("[T]he first general prohibition on felon gun possession was not enacted until 1961 . . . ."); *id.* at 462 ("[S]cholars have not identified eighteenth or nineteenth century laws depriving felons of the right to bear arms . . . .").

Section 922(g)(1) is the first law in our Nation's history to broadly prohibit all felons from possessing a firearm. There was nothing before the 20th century, even in individual colonies or states. *See* Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009) ("state laws prohibiting felons from possessing firearms or denying firearm licenses

to felons date from the early part of the twentieth century"). As *Bruen* makes clear, such "belated innovations . . . come too late to provide insight into the meaning of the Constitution in [1791]." *Bruen*, 597 U.S. at 36-37 (citing *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 312 (2008) (Roberts, J., dissenting); *see also id.* at 2154 n.28 (declining to "address any of the 20th century historical evidence brought to bear by [the government] or their amici").

History indicates that the opposite of § 922(g)(1) was enshrined in the Second Amendment. As noted by the *Heller* Court and Justice Thomas dissenting in *Rahimi*, "the Stuart Kings Charles II and James II succeed in using select militias loyal to them to suppress political dissidents in part by disarming their opponents." *Heller*, 554 U.S. at 592; *Rahimi*, 144 S. Ct. at 1934 (Thomas, J., dissenting). As a result, the founders were extremely aware and protective of individual liberty and the right to bear arms. As Justice Thomas further notes in his dissent, "laws targeting 'dangerous' persons led to the Second Amendment. It would be passing strange to permit the Government to resurrect those self-same 'dangerous' person laws to chip away at that Amendment's guarantee." *Rahimi*, 144 S. Ct. at 1934 (Thomas, J., dissenting).

Finally, and quite importantly, felons were not only permitted to possess firearms at the time of the founding due to the absence of any laws specifically prohibiting them from doing so; felons were affirmatively required to possess firearms as members of the militia. Notably, in *Heller*, the Supreme Court recognized that "the Second Amendment's prefatory clause"—*i.e.*, "A well regulated Militia, being necessary to the security of a free State"—"announce[d] the purpose for which the right was codified: to prevent elimination of the militia." 554 U.S. at 599. Given that preserving a militia was the purpose of the Second Amendment, the Second Amendment's protections would at least have extended to those who would have been in the militia at the time

15

of the founding. And historical evidence from the period confirms that this group most definitely included felons.

*Heller* specifically defined the term "militia" in the Second Amendment's prefatory clause to mean "all males physically capable of acting in concert for the common defense." 554 U.S. at 595. Indeed, statutory law from the founding era demonstrates that "all males" required to serve in the militia encompassed felons. Specifically, in the first Militia Act enacted one year after the Second Amendment's ratification, Congress was clear that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years . . . shall severally and respectively be enrolled in the militia." Act of May 8, 1792, § 1, 1 Stat. 271 (*see* Ex. B attached). The Act of 1792 further stipulated that "every citizen so enrolled . . . shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt," and various other firearm accoutrements, including ammunition. *Id.* Although the Act "exempted" many classes of people from these requirements (*e.g.*, "all custom-house officers," "all ferrymen employed at any ferry on the post road"), felons notably were not among those exempted. *Id.* § 2, § 1 Stat. 272.

In fact, at least eight state militia statutes, passed shortly before or after 1791, contained similar requirements. Specifically, these early state militia statutes similarly did not exempt felons:

- Mitchell, Statutes at Large of Pennsylvania, Act of March 20, 1780, §§ III, XXI, at 146, 154 (1700-1809);

- Wright and Potter, 7 Acts and Laws of the Commonwealth of Massachusetts, 1780-1805, ch. 14, at 381-82, 389-90 (1898);

- Thomas Greenleaf, Laws of the State of New-York, Act of April 4, 1786, at 227-28, 232-33 (1792);

- Marbury, Digest of Laws of the State of Georgia, Act of December 24, 1792, §§ 9-10, at 350 (1802);

16

- Constitution and Laws of the State of New-Hampshire, Act of Dec. 28, 1792, at 251-52, 256 (1805);

- Laws of the State of Delaware, ch. XXXVI, §§ 1, 2, 4, at 1134-36 (1797);

- Herty, Digest of the Laws of Maryland, "Militia," §§ 7, 15, 19, 20, at 367-70 (1799); and

- Public Statute Laws of the State of Connecticut, Title CXII, ch. I, §§ 1, 10, at 499-500, 505-06 (1808).

*See* Ex. A.

The fact that Founding era militia statutes did not exclude felons while requiring all militia members to possess firearms confirms that the government cannot meet its heavy burden at the second step of *Bruen*'s test to show that § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation. At the most relevant time period under *Bruen*, namely, the time period immediately preceding and post-dating adoption of the Second Amendment, all white, able-bodied men between the ages of 18 and 45—regardless of any status as a felon—were required to serve in both the national and many state militias. And because of their militia obligation, these men—regardless of any status as a felon—were required to possess firearms.

In sum, there was no "historical tradition," circa 1791, of gun regulations sufficiently similar to § 922(g)(1). The "Founders themselves could have adopted laws like § 922(g)(1) to "confront" the "perceived societal problem" of violence posed by felons possessing firearms. *Bruen*, 597 U.S. at 27. But they declined to do so, and that inaction shows that § 922(g)(1) is facially unconstitutional.

All that said, the Fourth Circuit has held that because there are "*some* set of circumstances" where § 922(g)(1) may be constitutionally applied, a facial constitutional challenge fails. *United States v. Canada*, 103 F.4th 257 (4th Cir. 2024). The *Canada* Court observed that the "law of the Second Amendment is in flux, and courts (including this one) are grappling with many difficult

17

questions in the wake" of *Bruen*. *Id.* at 257. *Canada* was decided before *Rahimi* but has been reaffirmed since. *Supra* n.1.

Mr. Morris submits that *Canada* was wrongly decided and should be reconsidered in light of *Rahimi*. This position is consistent with the Supreme Court's actions on numerous pending § 922(g)(1) certiorari petitions affected by the decision in *Rahimi*. Following *Rahimi*, The Supreme Court issued several orders granting petitions for writs of certiorari on constitutional challenges under *Bruen*, vacating the judgments, and remanding the cases back to lower courts for review in light of the Court's decision. Importantly, the decision in *United States v. Doss,* No. 22-3662, 2023 WL 8299064 (8th Cir. 2023), which was one of the pending certiorari petitions the Court granted-vacated-remanded, included a facial and as-applied challenge to § 922(g)(1). The Supreme Court deems *Rahimi* significant enough to have lower courts review their judgments for both facial and as-applied challenges to federal firearm regulations; as such, the Fourth Circuit's decision in *Canada* should be reconsidered post-*Rahimi*.

For all of the foregoing reasons, 18 U.S.C. § 922(g)(1) is facially unconstitutional.

### c.   Additionally, as applied to Mr. Morris, § 922(g)(1) is unconstitutional.

Applying the foregoing analyses to the facts of this case, § 922(g)(1) is also unconstitutional as applied to Mr. Morris. Mr. Morris was born and raised in Virginia. He is a lifelong citizen of the United States. ECF No. 10. He is thus one of "the people" that the Second Amendment demands must be allowed to bear arms. The plain text of the Second Amendment presumptively protects his alleged conduct in possessing the handgun found in this case.

Mr. Morris is prohibited from possessing firearms because of his status as a convicted felon, specifically his prior conviction for grand larceny: firearm, not from person with two probation revocations. His underlying felony offense occurred when he was 19 years old, was non-

violent, and initially resulted in a sentence of five days of incarceration (of a suspended sentence of 5 years of incarceration). Mr. Morris's Second Amendment rights have been, for all practical purposes, permanently revoked because of his felon status. Unlike *Rahimi*, § 922(g)(1) is not a temporary restriction, but a permanent infringement, more similar to the ongoing regulations considered in *Heller* and *Bruen*. Both the "how" and the "why" in Mr. Morris's case are without historical analogue. The surety laws and going-armed statutes discussed in *Bruen* and *Rahimi* had limitations regarding their application to people who were found to pose a risk of violence and they were temporary restrictions on a citizen's right to arm themselves. *Bruen*, 597 U.S. at 5; *Rahimi*, 144 S. Ct. at 1898-1901.

### III. Following *Bruen*, prosecuting Mr. Morris for subsequently possessing a machinegun violates his fundamental right to keep and bear arms under the Second Amendment, both facially and as applied.

Count Five charges Mr. Morris with violating 18 U.S.C. § 922(o). Section 922(o), which bans machinegun possession, also violates the Second Amendment both facially and as applied to Mr. Morris because it criminalizes possession of firearms "in common use" for the purpose of self-defense. Further, the statute is inconsistent with the Nation's historical tradition of firearms restrictions.

*Heller* confirmed that the right the Second Amendment protects is an individual right that includes "us[ing] arms in defense of hearth and home." *Heller*, 554 U.S. at 635. The word "arms" in the Second Amendment includes both "armour of defence" and "weapons of offence." *Heller*, 554 U.S. at 581. Since the founding of this country, "arms" has included "all firearms" that a person can "bear." *Id.* ("The 18th-century meaning is no different from the meaning today."). Further, the Second Amendment presumptively protects "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582; *see also Caetano*

*v. Massachusetts*, 577 U.S. 411, 412 (2016) (holding stun guns to be protected arms). While the "Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense"—including machineguns. *Bruen*, 597 U.S. at 28. Thus, the plain language of the Second Amendment covers machineguns under the first step of the *Bruen* test (plain text), meaning that § 922(o) is presumptively unconstitutional.

Turning to the second step of the *Bruen* test, whether banning machinegun possession is consistent with our country's historical traditions in regulating guns, *Bruen* makes clear that the focus of the analysis on the type of "arms" at issue lies in whether they are commonly possessed for self-defense:

> we explained there that the Second Amendment protects only the carrying of weapons that are those "in common use at the time," as opposed to those that "are highly unusual in society at large." *Ibid.* (internal quotation marks omitted). Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." *Id.*, at 629, 128 S. Ct. 2783. Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

*Id.* at 47. Clearly such weapons cannot be used to terrorize people, but banning the possession of commonly used "arms" does not comply with the dictates of the Second Amendment. *Id.* (recognizing that laws limiting self-defense laws in effect at the time of the Second Amendment's passage "merely codified the existing common-law offense of bearing arms to terrorize the people."). The carrying of weapons to have at the ready for self-defense is at the crux of the historical right to bear arms:

> The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize

> others. Similarly, although surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly.").

*Id.* at 59.

Machineguns are unquestionably in common use today for the purposes of self-defense. In fact, as of April 2020, there were more than 726,000 machineguns lawfully possessed in the United States and registered with the Bureau of Alcohol, Tobacco, Firearms and Explosives[2]. As of May 2021, that number had increased to more than 740,000 machineguns lawfully possessed and registered in the United States.[3] As of either 2015 or 2016, the ATF had just under 500,000 legally registered machineguns in its database. *See* Ex. C. These figures demonstrate that the legal market for machineguns in the United States has not only remained robust since Congress began regulating their possession in the mid-1930's, but has in fact grown by more than 150% in the three decades since Congress enacted a purported ban on the possession of machineguns.

The number of lawfully possessed machineguns is almost quadruple the number of lawfully possessed stun guns that Justice Alito found sufficient to characterize that weapon as "widely owned and accepted as a legitimate means of self-defense." *Caetano*, 577 U.S. at 420 (Alito, J., concurring); *see also Maloney v. Singas*, 351 F. Supp. 3d 222, 237-38 (E.D.N.Y. 2018) (finding evidence that the 64,890 nunchaku sold on the retail market in the United States between 1995 and 2018 were sufficient to show the weapon was "in common use"); *Avitabile v. Beach*, 368 F. Supp. 3d 404, 411-12 (N.D.N.Y. 2019) (finding evidence that at least 300,000 tasers were

---

[2] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2020*, 15–16 (2021), *available at* https://www.atf.gov/file/149886/download.

[3] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2021*, 15–16 (2021), *available at* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download.

owned by private citizens in the United States sufficient to show the weapon was "in common use"). These figures also only include lawfully owned firearms that were grandfathered in from before the passage of § 922(o) in 1986. *See* 18 U.S.C. § 922(o)(2)(B); Pub. L. No. 99-308, sec. 102 (May 19, 1986). The actual number of machineguns currently owned by Americans is undoubtedly significantly higher. Even unlawfully owned machineguns count for the purposes of assessing whether it is in "common use." *See Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) (explaining "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned.").

As applied to Mr. Morris, the argument against § 922(o) is even stronger. Mr. Morris is charged with possessing a Glock switch, a freestanding auto sear device that can convert a semiautomatic handgun into a fully automatic firearm. But even assuming such devices are machineguns, they are in common use for self-defense and recreation, even more so than machineguns generally. According to the ATF, between 2017 and 2021, nearly 55% of the total number of illegal firearms recovered were machinegun conversion devices like Glock switches.[4] As any law enforcement agent will tell you, they are everywhere on the streets. And whereas the prototypical machinegun is arguably a tool for war, a fully automatic handgun is not. The United States military does not issue fully automatic sidearms, and handguns have long been recognized as "the quintessential self-defense weapon." *Price*, 111 F.4th at 402 (quoting *Heller*, 554, U.S. at 629). Moreover, handgun auto sears are commonly sold as aftermarket accessories for Airsoft

---

[4] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *National Firearms Commerce and Trafficking Assessment: Firearms Trafficking Investigations - Volume Three Report, Part X: National Illegal Firearm Recoveries*, 4 (April 2024), *available at* https://www.atf.gov/file/190676/download.

guns. Alain Stephens and Keegan Hamilton, *The Return of the Machine Gun*, The Trace (Mar. 24, 2022), *available at* thetrace.org/2022/03/auto-sear-gun-chip-glock-switch-automatic-conversion/.

Section 922(o) is unconstitutional, both facially and as applied to Mr. Morris. *See United States v. Morgan*, Crim. No. 23-10047-JWB, 2024 WL 3936767 (D. Kan. Aug. 26, 2024) (granting as-applied challenge to § 922(o) charge).

## CONCLUSION

As set forth above, the Court should dismiss Counts One and Two of the indictment in this case as Mr. Morris's prosecution under both counts violates his Second Amendment right to keep and bear arms.

Respectfully submitted,

TAEKWON MALIK MORRIS

By:_____/s/_____
Virginia M. Bare
Member of the Maryland Bar
Assistant Federal Public Defender
Office of the Federal Public Defender
Attorney for Taekwon Malik Morris
500 E. Main Street, Suite 500
Norfolk, Virginia 23510
Telephone: (757) 457-0800
Telefax: (757) 457-0880
Email: ginnie_bare@fd.org
